SPECIFICATION OF ASSIGNED INTEREST

Executed pursuant to the Portfolio Purchase and Sale Agreement dated as of the 22nd day of December, 2017 (the "Agreement"), by and between BMO HARRIS BANK N.A., as Seller, and U.S. BANK EQUIPMENT FINANCE, a division of U.S. Bank National Association, as Purchaser.

This Specification is dated and effective as of the date set forth below and incorporates the terms and conditions of the Agreement.

1. The Accounts, Customers, remaining payments due under each Account and certain other information relating to each Account are set forth on Annex A hereto.

2. Consideration: $▮▮▮▮▮▮

3. Fiscal Agency: Seller shall act as Purchaser's fiscal agent under the terms of the Agreement.

4. Discount Rate: as set forth in Annex A attached hereto and made a part hereof.

5. Residual: as set forth in Annex A attached hereto and made a part hereof.

6. Payment Date: the 22nd day of each month (or the next business day if the 22nd is not a business day).

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**EXHIBIT**

**4**

tabbies

Date of Execution: March __24__, 2023

U.S. BANK EQUIPMENT FINANCE, a division of U.S.
Bank National Association
Purchaser

By: _____

Name: John Sherman

Title: Vice President

BMO HARRIS BANK N.A.
Seller

By: _____

Name: _____

Title: _____

Michael Ocampo
Senior Vice President

ANNEX A



USB 2Q23 - Mar -AA
Investor.xlsx

TO SPECIFICATION OF ASSIGNED INTEREST

Annex A to Specification of Assigned Interest 03/28/2023

| BMO Acct Sched | USBEF APP # | CUSTOMER NAME | DISCOUNT RATE | REMAINING PAYMENTS DUE | BOOKED RESIDUAL | ORIGINAL TERM | PAYMENTS SOLD | USBEF FIRST PAYMENT DATE | CONSIDERATION |
|---|---|---|---|---|---|---|---|---|---|
| ███ | ███ | ███ | ███ | ███ | | | | ███ | ███ |

Annex A to Specification of Assigned Interest 03/28/2023

| BMO Acct Sched | USBEF APP # | CUSTOMER NAME | DISCOUNT RATE | REMAINING PAYMENTS DUE | BOOKED RESIDUAL | ORIGINAL TERM | PAYMENTS SOLD | USBEF FIRST PAYMENT DATE | CONSIDERATION |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

Annex A to Specification of Assigned Interest 03/28/2023

| BMO Acct Sched | USBEF APP # | CUSTOMER NAME | DISCOUNT RATE | REMAINING PAYMENTS DUE | BOOKED RESIDUAL | ORIGINAL TERM | PAYMENTS SOLD | USBEF FIRST PAYMENT DATE | CONSIDERATION |
|---|---|---|---|---|---|---|---|---|---|

Annex A to Specification of Assigned Interest 03/28/2023

| BMO Acct Sched | USBEF APP # | CUSTOMER NAME | DISCOUNT RATE | REMAINING PAYMENTS DUE | BOOKED RESIDUAL | ORIGINAL TERM | PAYMENTS SOLD | USBEF FIRST PAYMENT DATE | CONSIDERATION |
|---|---|---|---|---|---|---|---|---|---|
| 1-001 | 4352 | NIKO LOGISTICS CORPORATION | | | - | 72 | 68 | 4/22/2023 | $ |

Annex A to Specification of Assigned Interest 03/28/2023

| BMO Acct Sched | USBEF APP # | CUSTOMER NAME | DISCOUNT RATE | REMAINING PAYMENTS DUE | BOOKED RESIDUAL | ORIGINAL TERM | PAYMENTS SOLD | USBEF FIRST PAYMENT DATE | CONSIDERATION |
|---|---|---|---|---|---|---|---|---|---|

Annex A to Specification of Assigned Interest 03/28/2023

| BMO Acct Sched | USBEF APP # | CUSTOMER NAME | DISCOUNT RATE | REMAINING PAYMENTS DUE | BOOKED RESIDUAL | ORIGINAL TERM | PAYMENTS SOLD | USBEF FIRST PAYMENT DATE | CONSIDERATION |
|---|---|---|---|---|---|---|---|---|---|

Annex A to Specification of Assigned Interest 03/28/2023

| BMO Acct Sched | USBEF APP # | CUSTOMER NAME | DISCOUNT RATE | REMAINING PAYMENTS DUE | BOOKED RESIDUAL | ORIGINAL TERM | PAYMENTS SOLD | USBEF FIRST PAYMENT DATE | CONSIDERATION |
|---|---|---|---|---|---|---|---|---|---|

Annex A to Specification of Assigned Interest 03/28/2023

| BMO Acct Sched | USBEF APP # | CUSTOMER NAME | DISCOUNT RATE | REMAINING PAYMENTS DUE | BOOKED RESIDUAL | ORIGINAL TERM | PAYMENTS SOLD | USBEF FIRST PAYMENT DATE | CONSIDERATION |
|---|---|---|---|---|---|---|---|---|---|
| █ | █ | █ | █ | █ | | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | | █ | █ | █ | █ |
| | | | | | | | | | $ █ |

## TITLING AGENCY AGREEMENT

THIS TITLING AGENCY AGREEMENT (the "Agreement") is dated as of March __28__, 2023 by and between U. S. BANK EQUIPMENT FINANCE, a division of U.S. Bank National Association ("Lender"), and BMO HARRIS BANK N.A. ("Agent").

WHEREAS, pursuant to a Specification of Assigned Interest dated the date hereof, which is being executed pursuant to that certain Portfolio Purchase and Sale Agreement dated as of December 22nd, 2017 (the "Purchase Agreement"), between Lender and Agent, Lender is purchasing from Agent Agent's right, title and interest in the secured loan transactions described therein (collectively, the "Accounts"), including but not limited to, Agent's interest in the vehicles described in the Accounts (the "Vehicles"); and

WHEREAS, the parties desire that Agent (or General Electric Capital Corporation, GE Capital Commercial Inc., and/or Transportation Truck and Trailer Solutions, LLC, as applicable, whose interest in the Vehicles was assigned to Agent) continue to be shown as the secured party or lienholder on the certificates of title to the Vehicles and to act as Lender's agent pursuant to the terms of this Agreement.

NOW THEREFORE, as an incident to the sale of Agent's interest in the Accounts and the Vehicles by Agent to Lender, and in consideration of the foregoing and of the mutual promises set forth herein, the parties agree as follows:

1.      Appointment as Agent. Lender hereby appoints Agent as Lender's agent for the following limited purposes: (i) to be named as, or serve as, the secured party or lienholder on the certificates of title relating to the Vehicles on behalf of Lender; (ii) to hold on behalf of Lender the original certificates of title or the lien certificates in the case of states that issue lien certificates with respect to the Vehicles; and (iii) to take any actions requested in writing by Lender solely relating to Agent's being named as, or serving as, the secured party or lienholder on the certificates of title relating to the Vehicles as agent for Lender, including but not limited to, upon the written request of Lender, assigning its interest as the secured party or lienholder to Lender or any designee of Lender. Agent hereby agrees to conduct its agency as Lender shall direct and shall not take any action with respect to the certificates of title except as expressly directed by Lender in writing. Lender hereby confers on Agent such powers as it possesses as are necessary for Agent to act as Lender's agent for being named as, or serving as, the lienholder or secured party on the certificates of title to the Vehicles. The parties agree that this appointment is for the administrative convenience of the parties. Agent undertakes to perform as agent on behalf of Lender such duties and only such duties as are specifically set forth herein and no implied covenants or obligations shall be read into this Agreement against Agent. Agent has no legal or beneficial title to, ownership of or interest in any of the Vehicles.

2.      Acceptance of Appointment. Agent hereby accepts its appointment as agent and agrees that Agent will be named as, or serve as, secured party or lienholder on the certificates of title only for the benefit of Lender and has no beneficial title to, ownership of or interest in the Vehicles. Without the prior written consent or direction of Lender, Agent hereby agrees not to take any action that would encumber the Vehicles or convey any interest therein.

3.      Power of Attorney. Lender hereby appoints Agent as its agent and attorney-in-fact to execute any and all documentation on behalf of Lender with respect to the certificates of title or registrations relating to the Vehicles. Such appointment is specifically limited to the express terms of the foregoing sentence, is coupled with an interest and is irrevocable.

4.      No Fee; Costs. Agent serves hereunder as agent without any fee. Notwithstanding any other provisions of this Agreement, except as otherwise provided in the Purchase Agreement, Agent shall have no liability for any fees or taxes imposed on or in connection with the Vehicles or certificates of title and Lender shall be responsible for all reasonable out-of-pocket costs and expenses incurred by Agent from and after the date hereof to the extent relating to the agency created hereby and any actions taken by Agent hereunder (expressly excluding any out-of-pocket costs and expenses incurred in the ordinary course of business, overhead or as a result of Agent's gross negligence, willful misconduct or breach of the terms hereof), and, to the extent that any such out-of-pocket costs or

expenses are borne by Agent, Agent shall provide prior written notice to Lender of such costs and expenses and Lender shall promptly reimburse Agent therefor.

5.     Terms of Appointment. Unless (a) Agent and Lender mutually agree in writing to terminate Agent's agency hereunder, (b) Agent's duties as fiscal agent with respect to the Account relating to the pertinent Vehicles are terminated in accordance with the terms of the Purchase Agreement, or (c) Agent's duties as agent with respect to the Account relating to the pertinent Vehicles are terminated upon a breach by Agent of its obligations under this Agreement and Lender has notified Agent of its election to terminate Agent's agency with respect to such Account, Agent's appointment hereunder shall extend until the Account relating to the pertinent Vehicles has expired, been terminated or been paid in full.

6.     Indemnity. Lender hereby agrees to indemnify, defend and hold Agent harmless from and against any and all losses, damages, suits, claims, demands, actions, taxes, fees, expenses and other harms whatsoever ("Claims") that arise out of or are attributable to the undertakings contemplated in this Agreement, including, without limitation, any Claim by any local, state or federal governmental authority seeking to recover taxes, fees or other charges relating to the Vehicles and the certificates of title except (i) to the extent Agent is liable for such amounts as seller under the Purchase Agreement and (ii) to the extent arising from Agent's gross negligence, willful misconduct or breach of the terms hereof.

7.     Delivery of Documents. Agent hereby agrees, promptly upon receipt, to deliver to Assignee all notices or other communications received by Assignor with respect to the Vehicles. Promptly following (i) any request by Lender following a default by the Obligor under an Account relating to a Vehicle; and (ii) any termination of the agency created hereunder with respect to any Vehicle, Agent shall deliver to Lender the original certificate of title or lien certificate with respect to such Vehicle, together with such documents as may be required to permit Lender to reflect its interest therein.

8.     Miscellaneous.

(a)     Any provision of this Agreement that is unenforceable in whole or in part in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such unenforceability without invalidating any remaining part or other provision hereof and shall not be affected in any manner by reason of such unenforceability in any other jurisdiction. The validity and interpretation of this Agreement and the rights and obligations of the parties hereto shall be governed in all respects by the law of the State of New York without giving effect to the conflicts of laws provisions thereof.

(b)     The parties agree from time to time to execute and deliver such documents, notices and other instruments as may be necessary or appropriate to cause all monies, credit or other property to be paid, distributed or delivered to the other party or as may be desirable in obtaining the full benefits of this Agreement and the rights and powers herein granted.

(c)     EACH OF THE PARTIES HEREBY UNCONDITIONALLY WAIVES THEIR RIGHTS TO A TRIAL BY JURY WITH RESPECT TO THIS AGREEMENT.

(d)     This Agreement may be executed in multiple counterparts, each of which will constitute an original and all of which together constitute but one agreement.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, Lender and Agent have duly executed and delivered this Agreement as of the day and year first written above.

U.S. BANK EQUIPMENT FINANCE,
a division of U.S. Bank National Association

By: _____

Name: _John Sherman_____

Title: _Vice President_____

BMO HARRIS BANK N.A.

By: _____

Name:_____
**Michael Ocampo**
**Senior Vice President**

Title:_____

PORTFOLIO PURCHASE AND SALE AGREEMENT

THIS PORTFOLIO PURCHASE AND SALE AGREEMENT ("Agreement") is made as of the 22nd day of December, 2017, by and between BMO HARRIS BANK N.A. a/k/a BMO Harris Bank National Association ("Seller") and U.S. BANK EQUIPMENT FINANCE, a division of U.S. Bank National Association ("Purchaser").

From time to time Seller shall enter into or acquire the lessor's interest under various equipment lease agreements or equipment or lease schedules that incorporate by reference the terms and conditions of master lease agreements of various dates (such equipment lease agreements and equipment or lease schedules that incorporate by reference the terms and conditions of a master lease agreement are referred to herein collectively as the "Leases" and individually as a "Lease") with various lessees (collectively the "Lessees", and individually a "Lessee"). Pursuant to the Leases, Seller shall lease or finance the equipment or other property described in the applicable Lease to the Lessee described therein.

From time to time Seller shall also enter into or acquire the lender's interest under various security agreements, loan and security agreements or loan agreements or collateral or equipment schedules executed pursuant to or incorporating by reference the terms and conditions of master security agreements of various dates (such security agreements, loan and security agreements or loan agreements and collateral or equipment schedules executed pursuant to or that incorporate by reference the terms and conditions of a master security agreement are referred to herein collectively, as the "Security Agreements" and individually as a "Security Agreement") with various borrowers (collectively the "Borrowers" and individually a "Borrower"), in connection with which Seller shall make a loan to Borrower, and Borrower shall agree to repay such loan pursuant to the Security Agreement. Pursuant to the Security Agreement, Borrower shall grant to Seller a security interest in the collateral described therein in order to secure the payment and performance by Borrower of the indebtedness evidenced thereby. The Lessees and Borrowers are sometimes referred to herein individually as a "Customer" and collectively as the "Customers".

From time to time, upon mutual agreement, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, Seller's rights, obligations, title and interest in and to a portfolio or portfolios of Leases and Security Agreements, and Seller's rights and interest in the equipment, property and collateral described therein, in each case, on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) in hand paid, the mutual promises made herein, and such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.      Conveyance; Purchase Price. (a) Conveyance. In exchange for Purchaser's full and final payment to Seller of the Consideration (as defined in part (b) of this Section and as set forth in the applicable Specification (as hereinafter defined)), and all of Purchaser's other agreements hereunder, Seller hereby sells, assigns, transfers and sets over to Purchaser, without recourse except as provided in this Agreement, all of Seller's rights, obligations (to the extent arising after the date set forth in the applicable Specification), title and interest (collectively, the "Interest"), and Purchaser agrees pursuant to the terms of this Agreement to fully accept and assume same, in, under and to (1) those Leases and Security Agreements (the Leases and Security Agreements described on the applicable Specification are referred to herein collectively as the "Accounts" and individually as an "Account") described on a Specification of Assigned Interests (in substantially the form attached hereto as Exhibit No. 1) entered into from time to time between Seller and Purchaser pursuant to the terms hereof (each a "Specification" and collectively, the "Specifications"), including the right to receive any and all sums due and to become due under, or recoverable in connection with, such Accounts; (2) in the equipment, property and collateral described in each such Account (the "Equipment"); (3) those certain guaranties (if any) described on the applicable Specification solely as they relate to said Accounts (such guaranties being collectively referred to as the "Guaranties" and individually as the "Guaranty"); and (4) any agreements, instruments, certificates, opinions, financing statements, public filings, bills of sale and other documents executed and delivered in connection with the Accounts, the Equipment and the transactions contemplated by the Accounts (such transaction documents being collectively referred to as "Transaction Documents," and individually, a "Transaction Document").

(b)      Consideration.  In exchange for the conveyance by Seller pursuant hereto and as evidenced by a Specification, Purchaser shall pay to Seller, in cash, the full amount of the Consideration specified on the Specification (the "Consideration"); and both parties agree that none of the right, title, interest or obligations so conveyed hereunder pursuant to a Specification shall pass to Purchaser unless and until Seller has received the full and final payment of the Consideration therefor.

(c)      Excluded Rights and Obligations.  Notwithstanding any provision of this Agreement or a Specification to the contrary, the Interests conveyed pursuant hereto shall expressly exclude any and all of the rights, remedies, liabilities and obligations under or with respect to any of the Accounts or Transaction Documents, to the extent the same arose, accrued, were payable or were attributable to the period prior to the date of the applicable Specification; provided, however, with respect to any indemnifications or other provisions of the Transaction Documents that are and remain exercisable or otherwise for the benefit of both Seller and Purchaser after the date of the applicable Specification, each of Seller and Purchaser shall be entitled to the non-exclusive rights and benefits of the same to the extent such indemnifications or other provisions relate to such party (e.g., a claim against or harm suffered by either such party for which an indemnification is available under the Transaction Documents); provided, further, in no event shall Seller have any rights to cancel or terminate any of the Accounts or Transaction Documents, or demand any rent, principal or liquidated damages, or take any action with respect to the Equipment after the date of the applicable Specification.  All such excluded rights, remedies and obligations shall be so retained by Seller.

2.      Seller's Warranties and Representations; Disclaimer.  (a) Warranties and Representations.

(1) With respect to each Account described in the applicable Specification, Seller hereby warrants and represents as of the date of such Specification: (i) each of the Transaction Documents to which Seller is a party which is the subject thereof: has been duly and validly authorized, executed and delivered by Seller; is in full force and effect with respect to Seller; and constitutes legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, and by applicable laws (including any applicable common law and equity) and judicial decisions which may affect the remedies provided therein; (ii) no payment default has occurred and is continuing under any Account and Seller has no knowledge that any other default or event which, with the giving of notice or lapse of time or both, would become a default, has occurred and is continuing with respect to any Account; (iii) the information set forth on such Specification and any schedules, annexes, or spreadsheets attached thereto or referred to therein is true and correct; (iv) each Account is documented on a form substantially similar to one of the forms attached hereto as Exhibit No. 3, and there are no changes to the terms and conditions thereof that would cause a material adverse effect on the Account that would affect the enforceability of the Account or Customer's obligation to pay any amount due thereunder; (v) Seller has not heretofore assigned or pledged any of the Interest assigned under this Agreement; (vi) there has been no prepayment of any rent, principal or other amounts under the Accounts except as reflected in the remaining payment stream and outstanding balance, as applicable, set forth in such Specification; (vii) Seller has no knowledge that any of the Transaction Documents to which any Lessee, Borrower or guarantor (collectively, the "Obligors", and individually an "Obligor") is a party, has not been duly and validly authorized, is not in full force and effect with respect to the Obligor and does not constitute legal, valid and binding obligations of the Obligor, as applicable, enforceable against such party in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, and by applicable laws (including any applicable common law and equity) and judicial decisions which may affect the remedies provided therein; (viii) with respect to any Equipment under a true lease, Seller is conveying to Purchaser good and valid title to such Equipment free and clear of any claims, liens and encumbrances created by or through Seller (other than those created in favor of the Customer under the Transaction Documents); and with respect to all other Equipment, Seller is conveying to Purchaser a valid first priority perfected security interest in such Equipment, free and clear of any claims, liens and encumbrances created by or through Seller (other than those created in favor of the Customer under the Transaction Documents);(ix) except as otherwise disclosed to Purchaser in writing, Seller has not granted to any Customer any allowance, credit memo, adjustment, or entered into any settlement, modification or amendment of an Account; (x) the capitalized lessor's cost of any Lease and the original principal amount of any Security Agreement has been advanced in full, all taxes required to be paid in connection with the Seller's acquisition of the Equipment under any Lease have been paid in full as of the date of the applicable Specification or are being billed to the applicable Lessee on the rents and all property taxes for which Seller is obligated to report and pay

with respect to any Equipment under any Lease have been reported and paid by Seller to the applicable taxing authority; (xi) Seller has no knowledge that any Account is subject to any defenses, setoffs or counterclaims; (xii) except as otherwise disclosed to Purchaser in writing, Seller has no knowledge that any Equipment has suffered a casualty loss; (xiii) Seller has no knowledge that any of the names, addresses and amounts contained in the Transaction Documents are not true and correct; (xiv) the number and amount of rent or installment payments remaining to be paid under the Account as of the date of such Specification is set forth on such Specification, net of any taxes; (xv) Seller has in its possession the original or copy of each Transaction Document, including the executed original of each Account that constitutes chattel paper; (xvi) no consent of any Customer is required for Seller to sell, assign and transfer any Account to Purchaser; (xvii) each of the Transaction Documents to which Obligor is a party has been duly and validly executed and delivered by Obligor; (xviii) with respect to each vehicle securing an Account, Seller has in its possession either a certificate of title or lien card showing Seller or its agent as owner or the first and only lienholder, as applicable, or a copy of the manufacturer's statement of origin and, if applicable, a vehicle application for title showing Seller or its agent as owner or lienholder, as applicable; (xix) throughout the term of each Account assigned hereunder, Seller will require each Obligor to maintain insurance coverage for the Equipment in accordance with its established policy used in conjunction with transactions held for Seller's account; (xx) with respect to any Lease, Obligor has executed and delivered a certificate of acceptance for all Equipment leased thereunder; (xxi) with respect to vehicles, trailers, construction equipment or other mobile items, to the best of Seller's knowledge, such items are stored at the location of the Equipment as set forth in the applicable Account when not on the road or at a worksite, and with respect to other Equipment, Assignor has no knowledge that the Equipment is not located at the location set forth in the Schedule, except as otherwise set forth or permitted in the Transaction Documents; and (xxii) as of the date of the applicable Specification, Seller has no knowledge that any Obligor is the subject of any bankruptcy or insolvency proceeding.

(2) Seller hereby warrants and represents that as of the date of the applicable Specification: (i) the execution of this Agreement, the Specification and the other documents executed in connection herewith (collectively, the "Transfer Documents") and of the Transaction Documents to which it is a party on its behalf and its participation in the transaction specified herein is in its ordinary course of business and within the scope of its existing corporate authority; (ii) there is no action, suit or proceeding pending against Seller before or by any court, administrative agency or other governmental authority which brings into question the validity of, or might in any way impair, the execution, delivery or performance by Seller of the Transfer Documents or any of the Transaction Documents to which Seller is a party; (iii) no approval of, or consent from, any governmental authority is required for the execution, delivery or performance by Seller of the Transfer Documents or any of the Transaction Documents to which Seller is a party; (iv) the execution, delivery and performance by Seller of the Transfer Documents and the Transaction Documents to which Seller is a party and the transactions contemplated hereby and thereby do not contravene any provisions of law applicable to Seller and do not conflict and are not inconsistent with, and will not result (with or without the giving of notice or passage of time or both) in the breach of or constitute a default or require any consent under, or result in the creation of any lien, charge or encumbrance upon the Equipment or the Accounts under any credit agreement, indenture, mortgage, purchase agreement, deed of trust, security agreement, lease, guarantee or other instrument to which Seller is a party, by which Seller may be bound, to which Seller or its property may be subject, or Seller's Charter or By-Laws; (v) each of the Transfer Documents constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, and by applicable laws (including any applicable common law and equity) and judicial decisions which may affect the remedies provided herein; and (vi) BMO Harris Bank N.A. is the same legal entity as BMO Harris Bank National Association.

(b)     Disclaimer. Except as set forth in this Section 2, Seller has not heretofore made, nor does it make by this Agreement or any Specification entered into in connection herewith, any representations or warranties; and Seller assumes no liabilities or responsibilities, with respect to the value or sufficiency of the Equipment, the due execution by the Obligor and/or the Vendor or the legality, validity, sufficiency, enforceability of or collectibility under any of the Transaction Documents or any document related thereto; and with respect to the Equipment conveyed pursuant hereto, SELLER CONVEYS ITS RIGHTS IN THE EQUIPMENT WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF TITLE, MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR FREEDOM FROM CLAIMS OF COPYRIGHT OR PATENT INFRINGEMENT.

3.      Purchaser's Warranties and Representations.  Purchaser hereby warrants and represents that as of the date of the applicable Specification:  (a) the execution of this Agreement on its behalf and its participation in the transaction specified herein is in its ordinary course of business and within the scope of its existing corporate authority; (b) there is no action, suit or proceeding pending against Purchaser before or by any court, administrative agency or other governmental authority which brings into question the validity of, or might in any way impair, the execution, delivery or performance by Purchaser of this Agreement or the performance by Purchaser under any of the Transaction Documents; (c) no approval of, or consent from, any governmental authority is required for the execution, delivery or performance by Purchaser of this Agreement or the performance by Purchaser under any of the Transaction Documents; (d) the execution, delivery and performance by Purchaser of this Agreement and the performance by Purchaser under the Transaction Documents and the transactions contemplated hereby and thereby do not contravene any provisions of law applicable to Purchaser and do not conflict and are not inconsistent with, and will not result (with or without the giving of notice or passage of time or both) in the breach of or constitute a default or require any consent under any credit agreement, indenture, mortgage, purchase agreement, deed of trust, security agreement, lease, guarantee or other instrument to which Purchaser is a party, by which Purchaser may be bound, to which Purchaser or its property may be subject, or Purchaser's Charter or By-Laws; (e) this Agreement constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, and by applicable laws (including any applicable common law and equity) and judicial decisions which may affect the remedies provided herein; (f) it understands that the conveyance of the Interest, to the extent it may involve the sale of a security, is being offered and sold without registration under the Securities Act of 1933, as amended (the "Act") and applicable state securities laws in reliance upon an exemption from the registration requirements of the Act and applicable state securities laws; (g) it understands that the conveyance of the Interest, to the extent it may involve the sale of a security, is subject to restrictions on transferability and resale except as permitted under the Act and applicable state securities laws and it is acquiring the Interest solely for its own account, for investment, and not with a view to resale, provided, however, nothing herein shall prohibit Purchaser from selling or assigning the Interest (or any portion thereof) in compliance with state and federal securities laws and regulations; (h) it has independently and without reliance upon Seller conducted its own credit evaluation, reviewed such information as it has deemed adequate and appropriate and made its own analysis of the forms of Transaction Documents; (i) it has not relied upon any investigation or analysis conducted by, advice or communication from, nor any warranty or representation by, Seller or any agent or employee of Seller, express or implied, concerning the financial condition of the Obligor or any Equipment, or the tax or economic benefits of the Transaction Documents; (j) notwithstanding the foregoing, it has had access to all financial and other information that it deems necessary to evaluate the merits and risks of the Transaction Documents including the opportunity to ask whatever questions and obtain whatever information necessary to verify the accuracy of any information provided and Purchaser acknowledges that Seller takes no responsibility for any financial information regarding the Obligor furnished to Purchaser by Seller; (k) it or its authorized representatives acting on its behalf have such knowledge and experience in business and financial matters necessary to evaluate the merits and risks of the Transaction Documents; and (l) Purchaser is experienced in entering into and purchasing transactions similar to the Transaction Documents and that it is financially able to undertake the risks involved in such a transaction.

4.      Delivery of Documents.  With respect to each Account, Seller shall deliver to Purchaser such documents and instruments (if any) as reasonably may be required by Purchaser to effect the assignment by Seller to Purchaser of any vendor or manufacturer warranties under any Transaction Documents solely to the extent applicable to the Equipment.  Purchaser may at all reasonable times, after giving Seller reasonable prior written notice thereof, inspect and audit such of Seller's books and records as are directly relevant to the Accounts.

5.      Covenants.  (a) Each of the parties covenants and agrees promptly to remit to the other party payments incorrectly received by such party with respect to any of the Transaction Documents or the Equipment after the execution of the applicable Specification.

(b)      Seller shall not, without the prior written consent of Purchaser, take any action which impairs the rights of the Purchaser (or its successor) with respect to the Accounts and Purchaser shall not, without the prior written consent of Seller, take any action that impairs the rights of the Seller with respect to any Leases or Security Agreements that are not conveyed to Purchaser pursuant to a Specification; provided, that the foregoing covenant shall not require either party to obtain the consent of the other prior to exercising any of its rights and remedies under any Lease or Security Agreement then owned by such party.

(c)     Purchaser shall be responsible for any taxes or charges, if any, assessed in connection with the acquisition by Purchaser of any Account, the Equipment, the Interest and the Transaction Documents from Seller. From and after the effective date of the applicable Specification, as between Seller and Purchaser, Purchaser shall be responsible for and shall cause to be paid or obtained (as appropriate) all sales, use, property or other taxes (to the extent attributable to or assessed with respect to the period from and after the date of execution of such Specification), licenses, or permits which are required to be paid or obtained in connection with the acquisition by Purchaser and/or the leasing by Purchaser of the Equipment described in any Account.

(d)     Seller authorizes Purchaser to file Uniform Commercial Code financing statements against Seller describing the collateral substantially as set forth in Exhibit No. 4 to reflect the assignment of the Interest by Seller to Purchaser.

(e)     Purchaser hereby agrees that it shall not contact any Customer or Obligor in any manner regarding this Agreement, any Account or the transactions contemplated hereby or thereby unless Seller's fiscal agency with respect to a specific Account has been terminated.

(f)     In the event Seller is terminated as fiscal agent pursuant to Section 6(i) hereof with respect to an Account (or, following any event of default under any Account if Seller is not serving as fiscal agent with respect to such Account), upon the Purchaser's request, Seller shall promptly deliver to Purchaser all original Transaction Documents in Seller's possession relating to the applicable Account.

6.     Fiscal Agency.  At the time that Seller and Purchaser execute and deliver a Specification pursuant to this Agreement, Seller and Purchaser may agree that Seller will act as Purchaser's fiscal agent pursuant to the terms set forth below in this Section 6.   Seller and Purchaser will evidence their agreement that Seller act as Purchaser's fiscal agent pursuant to this Section 6 by stating such in the applicable Specification.

(a)     Extent of Agency.  It is the intent and purpose of the parties that Seller, on behalf of Purchaser, shall (1) bill for, collect and receive all (A) rentals and installments, (B) sales and use taxes on the rents due under each Lease ("Sales and Use Taxes"), (C) personal property taxes and other similar taxes with respect to any Equipment under a Lease ("Personal Property Taxes"), and (D) other sums payable under each Account, excluding payments made as a result of a loss or damage to the Equipment, but shall not otherwise exercise any other rights, powers or privileges of the lessor under any Lease or the lender under any Security Agreement, and, (2) upon its receipt of payment of any Sales and Use Taxes and Personal Property Taxes (collectively, the "Taxes"), prepare all required tax returns for, and remit to the appropriate agencies, all Taxes required to be reported and paid by the lessor under the Lease; (3) file such financing statement continuations as are required under the UCC to maintain and continue the perfection of all security interests in the Equipment; (4) otherwise generally administer the Accounts and the related Transaction Documents, subject to the terms and conditions hereof; and (5) maintain possession of the Transaction Documents relating to an Account until such Account has been paid in full or Purchaser requests delivery of such documents in connection with an event of default or the termination of Seller as fiscal agent pursuant to Section 6(i) hereof. Nothing herein shall require Seller to pay any Taxes from its own funds. Seller will perform its obligations as servicer hereunder with the same degree of skill that Seller uses with respect to its own similar contracts taking into account variation by type of contract and customer and without discrimination against the Accounts.  Without limiting the foregoing, (i)Seller shall promptly provide Purchaser with copies of all material notices and, upon Purchaser's request, certificates of insurance and financial statements received by Seller in connection with the Transaction Documents; (ii) Seller shall request Purchaser's consent for any matter which requires the Purchaser's consent under the Transaction Documents in a timely fashion; and (iii) all negotiations with any Customer regarding any term or condition of the Transaction Documents (including, without limitation, any proposed amendments or modifications thereto or waivers thereof), shall be conducted by Seller in the same manner and standard of care as any other negotiation conducted by Seller for its own account; provided, however, Seller shall not agree to any such amendment, modification or waiver without Purchaser's prior written consent.  In the event that Seller requests Purchaser's consent or guidance with regard to any action to be taken with regard to any Account, Transaction Document or Equipment (including without limitation, in connection with any request received from any Customer), Purchaser shall use its best efforts to promptly respond to Seller with regard to such request.  Seller shall have no obligation to consent or take action without Purchaser's consent or instructions.

(b)     Default. Each party shall promptly notify the other if it has actual knowledge of any default under an Account or any Transaction Documents. Notice of a payment default may be given by the delivery of the monthly delinquency report described in Section 6(e) hereof. In the event of a default under an Account, at the option of Seller or Purchaser, this servicing agency shall terminate with respect to the defaulted Account and Seller shall have no right or obligation to exercise any rights or perform any duties as fiscal agent under this Agreement thereafter except to remit to Purchaser any monies paid to Seller under the Accounts and to provide to Purchaser any notices received by Seller with respect to such Accounts. As used in this Agreement, "actual knowledge" shall mean the actual knowledge of any person managing or monitoring the Account within the business unit of Seller that funded the Account (such as Transportation Finance).

(c)     Appointment. In furtherance of the parties' intent, Purchaser, subject to such election in the applicable Specification, hereby appoints Seller its fiscal agent and attorney-in-fact on the express terms set forth herein, and Seller accepts such appointment. Seller shall act as the fiscal agent for Purchaser hereunder without compensation except as herein provided or as set forth in the applicable Specification. The parties agree from time to time to (i) provide each other with their respective sales tax registration numbers upon request, (ii) provide each other with any information regarding the payment or reporting of any Taxes relating to an Account prior or subsequent to any assignment upon request, (iii) cooperate with each other in connection with any audit by a taxing authority of the billing, collection, reporting or paying of any Taxes relating to any Account, including providing proof of payment of such Taxes, (iv) promptly notify the other party in writing in the event it is notified of a change in location of the Equipment on an Account or that the location of the Equipment as set forth in the applicable Account is different from the actual location of such Equipment, and (v) execute and deliver such documents, notices, directions and other instruments as may be necessary or appropriate to cause all monies, credit or other property to be paid, distributed or delivered to Seller or Purchaser, as the case may be, or to properly pay, report or evidence the billing, collecting, reporting or paying of Taxes with respect to an Account or as may be desirable in obtaining the full benefits of this Agreement and the rights and powers herein granted.

(d)     Payments. All monies received by Seller as fiscal agent for Purchaser under or pursuant to any provision of this Agreement shall be held by Seller in trust as fiscal agent for Purchaser for the purpose for which they were paid, but need not be segregated in any manner from any other monies of Seller and may be deposited by Seller in any general account maintained by it. Except with respect to any Advances (as hereinafter defined) (or any evergreen payments, early termination payments or pay offs of an Account which payments will be paid by Seller to Purchaser on the Payment Date immediately following Seller's receipt of such payments), promptly upon receipt of such monies (in good collected funds) by Seller as fiscal agent for Purchaser, Seller shall make such monies available to Purchaser by wire transfer of such monies to Purchaser at such account as Purchaser may specify in writing from time to time. If any monies received by Seller from or on behalf of a Customer are subsequently dishonored or if it is otherwise determined that any such monies received by Seller do not constitute good funds, then Purchaser, promptly upon request from Seller, will remit to Seller in good funds such monies that had been remitted by Seller to Purchaser on account of the affected payment. If Seller determines at any time that any amount received or collected by Seller in respect of an Account or pursuant to any other Transaction Document must be returned to the Customer or paid to any other person or entity pursuant to any federal or state insolvency law, then notwithstanding any other provision of this Agreement, Seller shall not be required to distribute any portion thereof to Purchaser, and Purchaser will promptly after demand by Seller repay any such amount(s) that Seller shall have distributed to Purchaser, together with interest thereon at such rate, if any, as Seller shall pay to Customer or such other person or entity with respect thereto.

(e)     Servicer Advances.

(1)     During the term of each Account, Seller shall pay, on the Payment Date identified in the Specification (each a "Payment Date"), whether or not Seller has received payment of the corresponding Periodic Payment (as hereinafter defined) from the Customer, and to the extent due and payable by the Customer under the applicable Account, (a) to Purchaser, all periodic rental and installment payments due under such Account and (b) to the appropriate taxing authority, all Taxes as are then due and payable with respect to the rental payments and/or Equipment related to the Account; provided, however, that in the event that any such Taxes shall not be then due and owing to such taxing authority as of such Payment Date, then Seller shall retain said amounts in escrow, for the benefit of Purchaser, and shall duly pay and discharge, or cause to be paid and

discharged, prior to the date on which interest or penalties attach thereto, all lawful claims which, if unpaid, might become a lien or charge upon any of the Equipment and/or Account and all Taxes (items (a) and (b) hereof, to the extent due and payable by Customer in the applicable month are hereinafter referred to as the "Periodic Payments"). Payments made by Seller pursuant to the preceding sentence are hereinafter referred to as "Advances". Seller will make Advances in an amount up to one Periodic Payment, at any one time, per each Account and Seller is not obligated to make any Advances if any previous Advance has not been repaid to Seller. Advances will be repaid to Seller as follows: (i) payment of Periodic Payments by the Customer; (ii) by the Purchaser upon termination of Seller's obligation to make Advances; or (iii) by the Purchaser within thirty (30) days after the Payment Date if such Periodic Payment has not been received by Seller from the Customer. In the event Customer fails to pay to Seller monies in an amount sufficient to reimburse Seller for an Advance in full within thirty (30) days after the Payment Date, (i) Seller shall notify the Purchaser of such non-payment in the report described in subparagraph (2) hereof and (ii) Seller shall deduct that amount from the next Advance or the next Periodic Payment received by Seller or, if such deduction is not sufficient to reimburse Seller for an Advance in full, the Purchaser shall wire transfer monies to Seller in an amount sufficient to reimburse Seller for the unpaid portion of the Advance at such account as Seller may specify in writing from time to time. In the event that the Purchaser reimburses Seller for an Advance with respect to any Account and Seller thereafter receives, from the Customer, the Periodic Payment for which such reimbursement by the Purchaser has been made, Seller shall promptly forward such Periodic Payment so received from the Customer to the Purchaser (together with all late charges and overdue or default interest thereon related to any period after which Purchaser has repaid an Advance). Seller shall be entitled to collect, enforce and retain as servicing compensation any late charges or default interest related to any Periodic Payment with respect to which Seller has made an Advance. Late charges related to any period after which Purchaser has repaid an Advance will be paid to Purchaser.

(2)     On or before each Payment Date, Seller shall provide to the Purchaser a written report containing the following information: (i) the name of the Customers on the Accounts that are subject to an Advance made on such Payment Date, (ii) the due date of the next due Periodic Payment, (iii) Seller's Account number, and (iv) the amount of the Advance. Seller will also deliver to Purchaser a delinquency report once a month on the Payment Date that contains a list of delinquent Periodic Payments under the Accounts.

(3)     Seller's rights and duties to make Advances shall be terminated upon the following: (i) written notice by Seller with respect to any Account that has a Periodic Payment 30 days or more overdue, (ii) written notice by Seller to the Purchaser notifying Purchaser that Seller will not make any further Advances with respect to an Account under which a default (other than a payment default) or an event which with the giving of notice, the passage of time or both would become a default has occurred and is continuing under such Account, (iii) written notice by the Purchaser to Seller notifying Seller that the Purchaser is terminating Seller's right to make any further Advances with respect to an Account under which a default or an event which with the giving of notice, the passage of time or both would become a default has occurred under such Account, (iv) Purchaser and Seller agree to such termination in writing, (v) the bankruptcy or insolvency of Seller or Purchaser, (vi) written notice by Seller to the Purchaser notifying Purchaser that Seller will not make any further Advances with respect to an Account without any stated reason, or (vii) written notice by Purchaser that Seller has not timely made an Advance under a particular Account or otherwise breached its obligations hereunder with respect to such Account. Any terminations shall not reduce any obligations of the parties that occurred prior to such termination.

(f)     Limitations of Agency. Without the prior written consent of Purchaser, Seller shall not enter into any agreement or take any action (1) permitting amendment or modification of, or a waiver of or deviation from, any of the terms of any Account; (2) accelerating or otherwise changing the payment terms of any Account; (3) declaring a default under the Transaction Documents; (4) initiating any legal action against any Customer; or (5) settling or adjusting any payments under any insurance policy relating to the Equipment. Except as set forth in Section 6(h) hereof, Seller shall not be obligated to institute any legal action on behalf of Purchaser.

(g)     Notice of Assignment; Assignment of UCC Financing Statements. Upon the termination of Seller's servicing of an Account, Seller hereby agrees that it shall promptly execute and deliver to the Customer, any guarantor and Purchaser a Notice of Assignment in substantially the form attached hereto an Exhibit 2A or 2B (a "Notice"), whichever is applicable, and authorizes Purchaser to file an amendment to any Uniform Commercial Code

financing statement (the "UCC Filing") relating to such Account to effect the assignment of Seller's interest in the UCC Filing to Purchaser. No further authorization or act (other than the proper termination of Seller as servicer with respect to the applicable Account, in accordance with the terms hereof) shall be deemed required to authorize Purchaser to carry out the actions set forth in the preceding sentence. If Seller fails to execute and deliver a Notice in accordance with this Section 6(g), Purchaser may deliver to Customer and any guarantor a Notice in substantially the form attached hereto as Exhibit 2A or 2B, whichever is applicable, except such Notice shall be from and signed by Purchaser.

(h)     Litigation. If, as a consequence of this Agreement and Seller's servicing of an Account, and in order to preserve or enforce any right of Purchaser under the Transaction Documents, Purchaser may request Seller to initiate and pursue any legal action on behalf of Purchaser. If Seller elects to continue as fiscal agent hereunder and in such capacity to initiate and pursue any legal action on behalf of Purchaser, such action shall be conducted by Seller only at the express direction of Purchaser and Seller shall not be entitled to settle or compromise such action without Purchaser's prior written consent. All such expenses and attorney's fees of Seller, as a result of such action, shall be paid by Purchaser, to Seller promptly after receiving a copy of the invoice for any such attorneys' fees. If either Seller or Purchaser elects to terminate Seller as fiscal agent in accordance with Section 6(i) hereof, Purchaser shall be solely responsible to initiate and pursue any legal action to enforce the Transaction Documents, at Purchaser's sole cost and expense.

(i)     Termination. The Seller's duties as fiscal agent with respect to a particular Account shall be terminated upon the following: (i) the occurrence and continuance of a default under such Account beyond any applicable grace or cure period and Purchaser or Seller has notified the other party in writing of its election to terminate the Seller's servicing of such Account; (ii) Seller and Purchaser agree to such termination in writing; or (iii) upon a breach by Seller of its obligations under Section 6 of this Agreement, and Purchaser or Seller has notified the other party in writing of its election to terminate the Seller's servicing of such Account. Seller's duties as fiscal agent with respect to all Accounts shall automatically be terminated if any petition for relief under any bankruptcy or insolvency law is filed by or against Seller and in the case of an involuntary petition, such is not stayed (and thereafter continually stayed) or dismissed within sixty (60) days of institution, or Seller shall be insolvent, admit in writing its inability to pay any of its debts as they mature, makes an assignment for the benefit of creditors, a receiver or trustee shall be appointed, or Seller ceases to do business as a going concern. Any such termination shall not reduce any obligation of Seller that arose prior to such termination. Upon such termination, (i) Seller shall provide all records relating to the Account and servicing thereof including, but not limited to, that of each original Transaction Document and a copy of each Transaction Document of which Seller does not possess an original; (ii) Seller shall have no obligation or right to exercise any rights or perform any duties as fiscal agent under this Agreement thereafter except to remit to Purchaser any monies paid to Seller under the Accounts and to provide to Purchaser any notices received by Seller with respect to such Accounts; and (iii) the Purchaser shall have the sole right to pursue any and all remedies whether at law or in equity.

(j)     Limitations of Liability. (1) Seller undertakes to perform as fiscal agent on behalf of Purchaser such duties and only such duties as are specifically set forth herein and no implied covenants or obligations shall be read into this Agreement against Seller. (2) In all events as fiscal agent pursuant to the terms of this Section, Seller is entitled to use its discretion in respect to exercising or refraining from exercising any rights, or taking or refraining from taking any action which may be vested in Seller under each Account, or which Seller may be entitled to take or assert under any Account or any other agreements or instruments, and Seller shall not be liable to Purchaser for any action taken or omitted to be taken by it hereunder or pursuant hereto, except for Seller's gross negligence, willful misconduct or breach of its express obligations hereunder. (3) In acting in the future as fiscal agent for Purchaser hereunder, Seller may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties; and Seller shall not be bound to make any investigation into the facts or matters stated in any such resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order or other paper or document. (4) Seller may exercise its powers and perform its duties as fiscal agent by or through such attorneys, agents and servants as it shall appoint, and it shall be entitled to the advice of counsel in anything done or omitted to be done in accordance with such advice; and Seller shall not be required to take any action nor shall any provision herein set forth be deemed to impose a duty on Seller to take any action, if Seller shall have been advised by counsel that such action is contrary to the terms of any Account or is otherwise contrary to law.

(k)     Costs; Reimbursement. No provisions hereof shall require Seller to expend or risk its own funds (except for costs incurred in the ordinary course of Seller's business, general operating expenses and overhead) or otherwise incur any financial liability in the performance of any of its duties as fiscal agent for Purchaser hereunder. Any out-of-pocket expenses (as opposed to costs incurred in the ordinary course of Seller's business, Seller's general operating expenses and overhead) incurred by Seller in connection with its performance of its obligations under this Section shall be borne by Purchaser and Purchaser shall reimburse Seller for any such out-of-pocket costs and expenses incurred by Seller; provided, that Seller shall receive written approval from Purchaser for any single out-of-pocket expense greater than one thousand five hundred dollars ($1,500.00). Purchaser hereby agrees to reimburse Seller for any and all losses, damages, suits, claims, demands, taxes, fees and expenses that arise out of or are attributable to (i) any claim, suit, demand or other action by any Customer, guarantor, trustee, debtor-in-possession or other person endeavoring to collect any amount paid to Seller and forwarded to Purchaser pursuant to the fiscal agency established by this Section, (ii) any claim, suit, demand or other action by any local, state or federal governmental authority seeking to recover taxes, fees or other charges relating to any Account, the rentals, installments and other amounts payable thereunder, or the Equipment covered thereby, or (iii) any Taxes paid by Seller pursuant to Section 6(a) to the applicable taxing authority from Seller's own funds that have not been paid or reimbursed by the Customer; except, in each case, as expressly provided in Subsection (j)(2) of this Section.

(l)     Indemnity. Seller shall indemnify, defend and keep harmless Purchaser, on an after-tax basis, from and against any and all liabilities, obligations, losses, damages, costs and expenses (including, without limitation, reasonable fees and expenses of counsel) ("Claims") which shall at any time or from time to time be imposed upon, incurred by or asserted against Purchaser to the extent caused by, Seller's failure to deliver to Purchaser any original Account as required pursuant to this Agreement; provided, however, that the amount of such indemnity shall not exceed the then outstanding principal balance or the then outstanding lease balance, as applicable, of the applicable Account.

(m)     Early Purchase Options; Prepayments. In the event a Customer (x) prepays its Account in full or in part or (y) exercises an early purchase option in accordance with the terms of the Lease, and such amount is less than the amount necessary, with all Periodic Payments and any prepayment premium or fee paid under the Account or purchase price for such option, as applicable, by Customer to Purchaser, to pay off Purchaser's then outstanding Net Book Value for such Account (as to the applicable Equipment in a partial prepayment), Seller shall pay Purchaser the difference between the Purchaser's then whole or partial Net Book Value for such Account, as applicable, minus (x) with respect to a Security Agreement, the then outstanding principal balance of the Security Agreement (which amount shall be prorated based on the amount financed for the Equipment subject to a partial prepayment in relation to the total amount financed under the Account) plus the prepayment premium, if any, then required to be paid pursuant to the terms of the Security Agreement as in effect on the date hereof or (y) with respect to a lease, the amount the Customer is obligated to pay for such purchase option under the Lease (each, a "Supplemental Payment") within thirty (30) business days of the written request of Purchaser. Seller shall have no obligation to pay the Supplemental Payment (a) in the event an Event of Default or a Default, as defined in the Transaction Documents, has occurred; (b) if Purchaser allows prepayment or the purchase price for an early purchase option in an amount less than the amount specified in the Transaction Documents as in effect on the date hereof; or (c) in the event Customer prepays its Account or exercises its early purchase option and refinances such obligation with Purchaser. As used in this paragraph, the term "Net Book Value" shall mean, for any loan Account, (a) all accrued and unpaid sums due under the Transaction Documents as of the date of Customer's prepayment in full or in part as to a portion of the Equipment, plus (b) the present value, discounted to the date of Customer's prepayment at the Discount Rate (as set forth in Annex A to this Specification), of all future payments due under the Transaction Documents (as to the applicable Equipment in a partial prepayment), and for any lease Account, shall mean (a) all accrued and unpaid sums due under the Transaction Documents as of the date of Customer's purchase pursuant to the early purchase option, plus (b) the present value, discounted to the date of Customer's purchase at the Discount Rate (as set forth in Annex A to this Specification), of (i) all future rent due under the Transaction Documents, and (ii) the booked residual for such Account (as set forth in Annex A to this Specification). Purchaser hereby stipulates and agrees that, notwithstanding anything herein or in any Transaction Document to the contrary, a Customer may prepay any Account in part or in full, or may exercise its early purchase option, without prior notice to or further consent of the Purchaser provided that Purchaser receives payment of its Net Book Value of the portion of the Account prepaid in the event of a partial prepayment or its Net Book Value for the Account in the event of a full prepayment or the exercise of Customer's early purchase option.

(o)     Audit.  Seller agrees that, on reasonable prior written notice (which shall be at least fifteen (15) Business Days), it will permit any employee of Purchaser or an affiliate of Purchaser during the Seller's normal business hours to examine all the books of account, records, reports and other papers of Seller directly relating to the Interest, at Purchaser's sole cost and expense at the Seller's office where such books and records are then stored, to make copies and extracts therefrom, all at such reasonable times and in such a manner that will minimize any interference with the Seller's normal business operations.  Purchaser agrees not to conduct audits more than once per year.

7.     Miscellaneous.

(a)     Assignment.  This Agreement inures to the benefit of, and is binding upon, the successors and assigns of the parties hereto provided that while the Interest and the Transaction Documents may be transferred by Purchaser without the consent of Seller, neither party may assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld or delayed.

(b)     Notices.  All notices and other communications hereunder shall be in writing, personally delivered or sent by recognized overnight courier or certified mail, return receipt requested, addressed to the other party at its respective address stated below the signature of such party or at such other address as such party shall from time to time designate in writing to the other party; and shall be effective from the date of receipt.

(c)     Governing Law.  This Agreement and the rights and obligations of the parties hereunder shall in all respects be governed by, and construed in accordance with, the internal laws of the State of New York (without regard to the conflict of laws principles of such State), including all matters of construction, validity and performance.

(d)     Entire Agreement.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and shall not be amended or altered in any manner except by a document in writing executed by both parties.

(e)     Titles.  Section titles are for convenience of reference only and shall not be of any legal effect.

(f)     Further Assurances.  The parties further covenant and agree to do, execute and deliver, or cause to be done, executed and delivered, and covenant and agree to use their best efforts to cause their successors and assigns to do, execute and deliver, or cause to be done, executed and delivered, all such further acts, transfers and assurances, for the better assuring, conveying and confirming unto Purchaser and its successors and assigns, all and singular, the Interest and the Transaction Documents hereby assigned, and otherwise implementing the intention of the parties under this Agreement, as the parties and their successors and assigns reasonably shall request.

(g)     True Sale; Not an Extension of Credit.  This Agreement is intended to be an absolute and irrevocable sale, and shall constitute an absolute and irrevocable sale, of a 100% ownership interest in the Interest and shall in no way be construed as an extension of credit by Purchaser to Seller.  Seller and Purchaser each agree to treat the sale evidenced by this Agreement as a sale for accounting and tax purposes.  Seller waives and releases any right, title or interest that it may have (whether pursuant to a "cross-collateralization" provision or otherwise) in and to any of the Interest, the Accounts and/or the Equipment and Purchaser acknowledges and agrees that it is not acquiring or entitled to any right or interest in any equipment or other property described in any Lease or Security Agreement not acquired by Purchaser hereunder pursuant to a "cross-collateralization" provision set forth in any Lease or Security Agreement.

(h)     Brokers.  Neither party has, directly or indirectly, employed any broker, finder, financial advisor or intermediary (each a "Broker") in connection with the transactions contemplated by this Agreement who might be entitled to a brokerage, finders', or other fee or commission upon the execution of this Agreement, the applicable Specification, or the consummation of the transactions contemplated hereby.  If either party shall have engaged a Broker contrary to the foregoing representation, the party who entered into such agreement or arrangement shall be solely responsible for any fees or expenses due in connection therewith.

(i) Counterparts. This Agreement may be executed in any number of counterparts, all of which when taken together shall constitute one agreement binding on both Purchaser and Seller, notwithstanding that both parties are not signatories to the same counterpart.

(j) WAIVER OF JURY TRIAL. SELLER AND PURCHASER HEREBY UNCONDITIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS AGREEMENT, ANY OF THE TRANSACTION DOCUMENTS, ANY DEALINGS BETWEEN SELLER AND PURCHASER RELATING TO THE SUBJECT MATTER HEREOF OR THEREOF, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN SELLER AND PURCHASER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT (INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS). THIS WAIVER IS IRREVOCABLE MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR THE TRANSACTION DOCUMENTS. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(k) Confidentiality. Seller and Purchaser hereby acknowledge and agree that this Agreement, each Specification executed pursuant hereto, and the terms and conditions hereof and thereof are privileged and confidential and shall not be disclosed to any other party or entity, except to Seller's or Purchaser's advisors, accountants, auditors or attorneys or except as required by law, regulation or subpoena. Notwithstanding the foregoing, there is no restriction (either express or implied) on any disclosure or dissemination of the structure or tax aspects of the transactions contemplated by this Agreement or the Interests assigned hereunder. Further, Seller acknowledges that it has no proprietary rights to any tax matter or tax idea or to any element of the transaction evidenced by this Agreement or the Interests assigned hereunder.

(l) Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

(m) Survival. Seller and the Purchaser acknowledge and agree that the representations, warranties, indemnities and covenants of the parties set forth in this Agreement shall expressly survive the closing of the conveyance of the Interest.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal as of the day and year first above written.

U.S. BANK EQUIPMENT FINANCE,
a division of U.S. Bank National Association
Purchaser

By: _____

Name: _____

Title: _____

13010 SW 68th Parkway
Suite 100
Portland, OR 97223
Attention: Legal Department

BMO HARRIS BANK N.A.
Seller

By: _____

Name: _____ Michael Ocampo

Title: _____ Senior Vice President

300 E. John Carpenter Freeway
Suite 510
Irving, TX 75602-2712
Attn: Legal Department

By its signature below, the undersigned represents, warrants and confirms that the undersigned is the same legal entity for the purposes of this Agreement and each Specification thereunder as U.S. Bank Equipment Finance, a division of U.S. Bank National Association.

U.S. BANK NATIONAL ASSOCIATION

By: _____

Name: _____

Title: _____

## EXHIBIT NO. 1

### SPECIFICATION OF ASSIGNED INTEREST

Executed pursuant to the Portfolio Purchase and Sale Agreement dated as of the _____ day of December, 2017 (the "Agreement"), by and between BMO HARRIS BANK N.A., as Seller, and U.S. BANK EQUIPMENT FINANCE, a division of U.S. Bank National Association, as Purchaser.

This Specification is dated and effective as of the date set forth below and incorporates the terms and conditions of the Agreement.

1. The Accounts, Customers, remaining payments due under each Account and certain other information relating to each Account are set forth on Annex A hereto.

2. Consideration: $_____

3. Fiscal Agency: Seller shall act as Purchaser's fiscal agent under the terms of the Agreement.

4. Discount Rate: as set forth in Annex A attached hereto and made a part hereof.

5. Residual: as set forth in Annex A attached hereto and made a part hereof.

6. Payment Date: the _____ day of each month (or the next business day if the _____ is not a business day).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Date of Execution: _____, 20__

| U.S. BANK EQUIPMENT FINANCE, a division of U.S. Bank National Association<br>Purchaser | BMO HARRIS BANK N.A.<br>Seller |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |

[ANNEX A

TO SPECIFICATION OF ASSIGNED INTEREST]

## EXHIBIT NO. 2A

_____

Re:     Notice of Assignment - [Loan and Security Agreement][Schedule A] dated as of _____, 20___ (the "Account") [incorporating by reference the terms and conditions of that certain Master _____ Agreement dated as of _____, ____,] between BMO Harris Bank N.A. ("BHB")[, as successor in interest to] [General Electric Capital Corporation][GE Capital Commercial Inc.], and _____ ("Customer").

Ladies and Gentlemen:

BHB hereby gives Customer notice that BHB has assigned to U.S. BANK EQUIPMENT FINANCE, a division of U.S. Bank National Association ("Purchaser"), whose offices are at 1310 Madrid Street, Marshall, MN 56258, all right, title, interest and obligations of BHB in and to the Account, the equipment described on the Account (the "Equipment") and any related documents. From and after the date of this Notice, all payments of rent, principal and interest and other sums now or hereafter becoming due pursuant to the Account shall be paid directly to Purchaser as Purchaser shall direct in Purchaser's invoices and any notices or other correspondence to be delivered by Customer pursuant to the Account shall be delivered to Purchaser at the address specified above or pursuant to written instructions provided by Purchaser to Customer.

BMO HARRIS BANK N.A.

By: _____
Name: _____
Title: _____

EXHIBIT NO. 2B
(GUARANTOR)

_____
_____
_____

_____
_____
_____

Re:     Notice of Assignment - [Loan and Security Agreement][Schedule A] dated as of _____ \_\_\_, 20\_\_\_ (the "Account") [incorporating by reference the terms and conditions of that certain Master _____ Agreement dated as of _____, \_\_\_\_,] both between BMO Harris Bank N.A. ("BHB")[, as successor in interest to] [General Electric Capital Corporation][GE Capital Commercial Inc.] [("GE")], and _____ ("Customer"); and that certain Corporate Guaranty dated as of _____, \_\_\_\_ (the "Guaranty"), by _____ ("Guarantor") in favor of BHB[, as successor in interest to GE].

Ladies and Gentlemen:

BHB hereby gives Customer and Guarantor notice that BHB has assigned to U.S. BANK EQUIPMENT FINANCE, a division of U.S. Bank National Association ("Purchaser"), whose offices are at 1310 Madrid Street, Marshall, MN 56258, all right, title, interest and obligations of BHB in and to the Account, the equipment described in the Account (the "Equipment"), the Guaranty (to the extent the Guaranty relates to the Account and the transaction contemplated thereby) and any related documents. From and after the date of this Notice, all payments of rent, principal and interest and other sums now or hereafter becoming due pursuant to the Account shall be paid directly to Purchaser as Purchaser shall direct in Purchaser's invoices and any notices or other correspondence to be delivered by Customer pursuant to the Account shall be delivered to Purchaser at the address specified above or pursuant to written instructions provided by Purchaser to Customer.

BMO HARRIS BANK N.A.

By: _____
Name: _____
Title: _____

EXHIBIT NO. 3

FORM OF ACCOUNTS

[Attach Applicable Forms of Seller's Contracts]

## EXHIBIT NO. 4

### UCC COLLATERAL DESCRIPTION

This filing is made pursuant to Section 9-109(a) of the Uniform Commercial Code in connection with the sale by Debtor, as seller, to Secured Party, as purchaser, under that certain Portfolio Purchase and Sale Agreement dated as of December 22nd, 2017, of all of Debtor's right, title and interest in and to those certain Loan and Security Agreements or other form of chattel paper related to the accounts set forth in Exhibit A attached hereto ("Accounts") and all cash and non-cash proceeds thereof. A purchase of the Accounts described above from Debtor would violate the rights of Secured Party.

[Attach a list of the Account Schedule Numbers on an Exhibit A to each UCC financing statement filed pursuant to an assignment of Accounts under this Agreement.]